1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF TEXAS
 2                 BEAUMONT DIVISION

 3
    UNITED STATES OF AMERICA  |  DOCKET 1:21-CR-00009 (1)
 4                            |
                             |  JUNE 17, 2021
 5   VS.                      |
                             |  2:31 P.M.
 6                            |
    SHASHANK SHEKHAR RAI      |  BEAUMONT, TEXAS
 7
    -----------------------------------------------------
 8

 9         VOLUME 1 OF 1, PAGES 1 THROUGH 24

10       REPORTER'S TRANSCRIPT OF SENTENCING HEARING

11       BEFORE THE HONORABLE MARCIA A. CRONE
                UNITED STATES DISTRICT JUDGE
12
    -----------------------------------------------------
13

14  APPEARANCES:

15  FOR THE GOVERNMENT:    JOSEPH BATTE
                           US ATTORNEY'S OFFICE
16                         350 MAGNOLIA AVENUE
                           SUITE 150
17                         BEAUMONT, TEXAS 77701

18                         LOUIS MANZO
                           DEPARTMENT OF JUSTICE-WASHINGTON
19                         1400 NEW YORK AVE NW
                           WASHINGTON, DC 20005
20

21  FOR THE DEFENDANT:     JOSEPH HAWTHORN
                           2630 LIBERTY AVE
22                         BEAUMONT, TEXAS 77702

23

24

25
```

```
 1  COURT REPORTER:         RUTH C. WEESE, RDR-CSR
                            FEDERAL OFFICIAL REPORTER
 2                          300 WILLOW, SUITE 104
                            BEAUMONT, TEXAS  77701
 3

 4
       PROCEEDINGS REPORTED USING COMPUTERIZED STENOTYPE;
 5    TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1          (OPEN COURT, DEFENDANT PRESENT.)

2          THE COURT:  Finally we have 1:21-CR-00009 (1),

3   *United States of America versus Shashank Shekhar Rai.*

4          MR. BATTE:  Your Honor, Joe Batte for the

5   Government along with Louis Manzo, trial attorney with

6   the Department of Justice Fraud Section.  Mr. Manzo is

7   down here from Washington, DC and he will be handling the

8   sentencing on behalf of the Government.

9          MR. MANZO:  Good afternoon, Your Honor.

10          MR. HAWTHORN:  I'm Lum Hawthorn and I'm here

11   for the Defendant, Your Honor.

12          THE COURT:  Okay.  Very well.

13          Have counsel and the Defendant read and

14   discussed the presentence report, including any

15   revisions, as well as the special conditions of

16   supervised release listed in the separate supervision

17   conditions recommendation attached to the presentence

18   report?

19          MR. HAWTHORN:  Yes, Your Honor.

20          THE COURT:  Has counsel fully explained the

21   presentence report to the Defendant?

22          MR. HAWTHORN:  I have.

23          THE COURT:  And, Mr. Rai, do you fully

24   understand the presentence report, including the special

25   conditions of supervised release?

4

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  Does counsel or the Defendant wish

3    to make any comments, additions or corrections to the

4    report?

5          MR. HAWTHORN:  No, Your Honor.

6          THE COURT:  And, Mr. Rai, does the report

7    adequately cover your background?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  Has the Government read the report

10   and does it wish to make any comments, additions or

11   corrections?

12         MR. MANZO:  Your Honor, I believe we have a

13   dispute about the sentencing score, but no factual

14   corrections.

15         THE COURT:  Right.  There are objections.  I

16   will get to that in a minute.  Okay.  So there's an

17   objection that's been filed.  Mr. Hawthorn, do you wish

18   to address that?

19         MR. HAWTHORN:  Briefly, Your Honor.  Our

20   objection is to the calculation of the loss in this case.

21   We are contending that the loss calculation should be

22   zero.  The reason being that the loss in this case was

23   zero.  The loans in question were never funded.

24   Therefore, there was no loss to the Government, to any

25   financial institution as a result of Mr. Rai's conduct.

5

1   The guidelines in the cases state that where there is no

2   actual loss, it's the intended injury to the complainant

3   that the courts look at to calculate what the loss should

4   be.

5             In a loan type case that we have here, that is

6   whether or not the Defendant intended to repay the loans.

7   The Government has the burden of proving by a

8   preponderance of the evidence that he did not intend to

9   repay the loans.  He did intend to repay the loans.

10  There is no evidence to the contrary.  He has always paid

11  his financial obligations.  There is no information in

12  the record that would indicate that he would not pay his

13  financial obligations.  He has no criminal record.  He

14  has paid all the loans that he has ever made.  He cashed

15  in a substantial 401(k) plan from his employer whenever

16  he was charged in this particular case.  He placed -- he

17  did not try to secret that money.  He placed it in

18  investments.

19            So it's our contention, Your Honor, that

20  according to the cases and the guidelines, the loss

21  calculation should be zero.  We submitted briefs in our

22  arguments in support of that proposition and we rely on

23  those.

24            THE COURT:  All right.  Do you wish to

25  respond?

6

1          MR. MANZO:  Thank you and good afternoon, Your

2    Honor.  The Payroll Protection Program was a program

3    designed to help small businesses during a pandemic.

4    More than anything, it was designed to be almost like a

5    grant where if a small business received the money and

6    used it for a specific means such as paying for employees

7    to stay in the employ of the business, that loan could

8    then subsequently be forgiven.

9          The Defendant took advantage of this program.

10   It was designed to help employees stay afloat during the

11   pandemic.  He applied for one program -- he applied once

12   for a $10 million loan and he subsequently applied again

13   for a $3 million loan using his shell company which did

14   not exist in real life and employed no people.  It had no

15   operations.

16         In these packages he submitted fake tax

17   documents and fake payrolls.  He followed up with phone

18   calls and e-mails to the loan processors.  It was a

19   consistent and sustained effort to steal taxpayer money,

20   not a one-time lapse in judgment.

21         Under the sentencing guidelines, intended loss

22   is a pecuniary harm that would have resulted from a

23   fraud.  And that's here 100 percent of the money that he

24   applied for, the 13 million.  The PPP is not the Rai

25   Family investment fund.  The federal government could

7

1  have created a fund for pure speculation for investments

2  along the lines what the Defendant claims he was going to

3  use the money for, but it didn't.  It created a fund used

4  to help employees and small businesses during the

5  pandemic.

6          When he applied for the funds using fraudulent

7  tax documents and fraudulent payrolls, he was putting in

8  jeopardy the ability for other businesses and other

9  employees to receive access to those funds.

10          Under *Dowl,* which we quoted in our papers, the

11  intention to divert government funds from the intended

12  use is the intended loss amount.  Our stance is that the

13  defense is trying to complicate this issue unnecessarily.

14  There's no intent to repay requirement.  And even if

15  there was, there is no evidence that the Defendant

16  intended to repay any money.  The defense points to a

17  note pulled from the Defendant's trash during the

18  investigation that outlined an investment strategy that

19  the Defendant could have employed.  It involved

20  $1 million for three different areas of investment,

21  including options and futures.

22          There's nothing in that document about any

23  intent to repay.  Even if the Court were to find that the

24  Government had some intent or the -- even if the Court

25  were to find the Government had some, you know, had some

1  burden to show that the Defendant did intend to repay the

2  money, the Court could find that the Defendant was

3  reckless in intending to defraud the loan.  The Defendant

4  admits in the plea paperwork and in the information that

5  he submitted two false loan applications.  The Defendant

6  admits to submitting them to the Payroll Protection

7  Program.

8          If the Defendant wanted to get a loan via

9  false paperwork and false statements, and then he

10  intended to repay it back, he could have gotten any loan.

11  He could have gone down to his local bank and applied for

12  a fraudulent loan that way.  The reason that he applied

13  for a Payroll Protection Program loan is because it is

14  forgivable.

15          And finally, if you looked at what the

16  Defendant was doing here by creating the fake payrolls

17  and fake tax documents, if he then came back after when

18  it was time to either seek forgiveness for the loan or to

19  repay the money, and he all of a sudden decided to change

20  the scheme, it would raise red flags.

21          It would be incomprehensible, illogical for

22  the Defendant having obtained the loan via false

23  pretences, then pay the money back.  It would be as if a

24  bank robber was going back to the bank after the offense

25  having used the money for his purposes and then returning

9

1   the rest saying that he didn't need it.  It would be

2   inconsistent with the offense at hand and it would be

3   inconsistent with logic.

4           Finally, we'd like to just cite to a couple of

5   cases again we put in our motions that I thought were

6   illustrative of why the Defendant should be held for the

7   full 13 million of intended loss amount.

8           In *U.S. v. Lane* the court there had a quote.

9   It said gamblers often lose.  In that case the courts

10  said the sentencing guidelines focus on conduct of the

11  Defendant and the objective financial risk.

12          So even taking the Defendant's words, which

13  again are unsupported by really any evidence that he

14  intended to pay back the money because he was going to

15  invest it in the stock market, gamblers often lose.  The

16  stock market is not a guaranteed return.  The investment

17  strategy he wrote on a small piece of paper was extremely

18  risky.  And there again is no evidence that he sought to

19  return the money again.

20          And then two more cases cited here, *U.S. v.

21  Sowels*, and that stands for the premise or the case law

22  that incomplete offenses equal -- in an incomplete

23  offense the intended loss equals the total amount of

24  funds put in jeopardy by the Defendant's actions.  And

25  this is a case where the Government was able to step in,

1  prevented the second $3 million loan from going out.  The

2  Defendant, if he had received the money and then provided

3  some evidence that he was intending to pay back the money

4  either through his actions or through his statements, we

5  might be in a different situation.  But here as in

6  keeping with *Sowels*, it is an incomplete offense and

7  *Sowels* stands for the proposition that the intended loss

8  equals the total amount of funds put in jeopardy by the

9  Defendant's actions.

10           Finally, the holding in *Wimbish* also supports

11  the Government's stance on the loss amount.  Intended

12  loss is the amount recklessly put at risk.  The Defendant

13  recklessly put that money that he tried to steal at risk

14  by taking it from the taxpayer.  There is no evidence

15  that he intended to pay it back.  There is some evidence

16  that he intended to invest it in the stock market.  But

17  there's absolutely no evidence that he intended to use it

18  for any kind of use in keeping with the program.

19           For those reasons, the Government thinks that

20  the intended loss amount should be the 13 million

21  outlined in the motions in this case.

22           THE COURT:  Anything further?

23           MR. HAWTHORN:  None of the cases cited by the

24  Government in this -- on this particular issue are the

25  same as the facts in this particular case.  In this case

1   the Defendant got no money.  In the cases cited by the

2   Government, there was partial funding.  Also in the cases

3   cited by the Government, there was some background to the

4   Defendant concerning reckless conduct that they had been

5   involved in previously.

6          Here there's no evidence that this Defendant

7   has ever been involved in any reckless conduct.  To the

8   contrary.  He has been a very stable person his entire

9   life.  I will agree this was a harebrained scheme, but

10  there's no evidence that he did not intend to pay this

11  money back, nor that he did not have the ability to pay

12  the money back.  And for that reason, we think that the

13  loss amount in this particular case should be what the

14  loss amount is, zero.

15          THE COURT:  Well, the Court finds that

16  intended loss is what's at issue here.  And the Court

17  finds that Rai intended to cause the loss of

18  $13,0006,200, the amount he attempted to receive through

19  the Paycheck Protection Program loans.  The whole point

20  of these loans and what's attractive to Mr. Rai and

21  others is because they are forgivable.  That's what

22  distinguishes it from the other available loans he could

23  have gotten at the same time from the SBA.  There were

24  favorable interest rates, but those you had to pay back.

25  These were forgivable.  Although he claims he intended to

6-17-21 Sentencing Hearing

12

1   repay the loans, I think his actions suggest otherwise.

2           First, he chose to apply for a forgivable PPP

3   loan rather than a non-forgivable loan.  Unlike most

4   loans, eligible borrowers of PPP loans qualify for full

5   loan forgiveness.

6           And so the statistics show First Draw PPP

7   loans made to eligible borrowers qualify for full loan

8   forgiveness if during the 8 to 24-week covered period

9   following loan disbursement the employee compensation

10  levels are maintained, loan proceeds are spent on payroll

11  costs and other eligible expenses and at least 70 percent

12  of the proceeds are spent on payroll costs.  Mr. Rai

13  devised false tax returns and payroll records to try and

14  substantiate these kind of figures that would allow him

15  to get large loans, ten million and three million, in

16  funds by saying he had these high payroll costs.  And so

17  within the 8 to 24-week period using those false figures

18  he would be repaying.  I mean he used the same kind of

19  false records to support showing that he paid payroll as

20  he did to try to get the loans.

21          It was discovered that it wasn't genuine.  I

22  don't know how that occurred, but I think it's clear that

23  he was trying to get this money, not just once, but twice

24  and because they were forgivable.

25          And apparently by January 2021 the SBA had

1  forgiven nearly 85 percent of the PPP loans.  And the SBA

2  had several lending programs available with lower

3  interest rates and more favorable terms than loans from

4  private lenders, but Mr. Rai didn't get that to get his

5  money for investment, he got the forgivable PPP loans.

6  He tried to get that.  He falsified documents to support

7  a request to have the loan forgiven.  He created fake tax

8  returns, payroll records in support of the first and

9  second loan applications, used false payroll expenses

10  when extended over a two-month period easily amounted to

11  more than 75 percent of the requested PPP loan amount.  I

12  mean he didn't say that he had payroll of 20,000, but he

13  said he had payroll in large amounts that would cover --

14  that would extend to the ten million and the three

15  million that he was intending to get from the PPP loans.

16  So with those kind of payroll requirements, if he had

17  those people indeed on the payroll and kept them on his

18  payroll he would easily devote the funds to the payroll

19  expenses and other eligible expenses within the requisite

20  time frame of the 8 to 24 months -- 8 to 24 weeks.

21          So I think the way he structured the whole

22  thing suggests he was getting these PPP loans because

23  they were forgivable.  So I think that refutes the notion

24  that he intended to pay it back.  He may have intended to

25  use the money for investment purposes, but he thought he

1  could use the money for investment purposes, didn't

2  matter whether he paid it back, he could use it, but he

3  hoped to keep it without having to pay it back.

4        I think the whole -- it was all targeted to

5  this very unique program.  It's very unusual that the

6  Government is going to allow you to have money that's a

7  forgivable loan.  And I think he capitalized on the

8  unfortunate circumstances that many business found

9  themselves in when they couldn't maintain their payroll,

10  couldn't maintain their business and needed this type of

11  assistance.  Mr. Rai didn't need this.  He was just -- I

12  don't know what would motivate him to do this, but it is

13  like he thought he was the smartest guy in the room.  He

14  could get this free money from the Government and invest

15  it and who knows, but it doesn't make any sense that he

16  was intending to pay it back because there are other

17  avenues he could have gotten loans if he wanted to get

18  money for investment to pay back.

19        I think his -- in any event, certainly he

20  exhibited a conscious indifference and recklessness in

21  the way the funds obtained could have been repaid.  He

22  was going to try to invest them, but they were a very

23  risky plan to do that.  Certainly the stock market can't

24  be depended on to generate income.  If you have lost

25  money in the stock market, there's no guarantees there.

15

1  So it may be the investment strategy really didn't make a

2  lot of sense that a reasonable investment -- investor

3  would assure that their portfolio would be protected.  I

4  think he intended to -- by his own admission he intended

5  to gamble funds in risky, complicated financial

6  instruments which would put the funds in jeopardy.  He

7  did seem to cash in his 401(k), but he invested in very

8  speculative on-line trade entities which may be to his

9  advantage, but that's fine, that's his money, he can do

10  what he wishes with that.  But this is not appropriate to

11  use with the PPP funds at all which are restricted to

12  covering payroll expenses for people who are adversely

13  affected by Covid-19 pandemic restrictions and other

14  eligible expenses.

15          I also find -- it's really not an objection,

16  but I think the Government brought it out or I think

17  probation brought out, the sophisticated means that he

18  used to do this.  I think that his actions justify a

19  two-level increase, the sophisticated means under United

20  States Sentencing Guideline 2B1.1(b)10(c).  He had a

21  shell company, Rai Family, LLC, registered in 2019.  But

22  he had no active operations or employees.  But he then

23  created fake -- complicated fake tax returns and payroll

24  records to make the company appear to be a legitimate

25  operating entity.  He said the employees were in Texas.

6-17-21 Sentencing Hearing

16

1   He applied to two different financial institutions to

2   fraudulently receive government funds from the program.

3   He used the false tax and payroll records in support of

4   the applications.  So I think this is certainly a

5   sophisticated scheme that he devised in order to try to

6   get these funds.  So the objection is overruled.

7          To the extent the Court previously deferred

8   acceptance of the plea agreement, it is now accepted and

9   the judgment and sentence will be consistent with it.

10  The Court finds the information contained in the

11  presentence report has sufficient indicia of reliability

12  to support its probable accuracy.  The Court adopts the

13  factual findings, undisputed facts and guideline

14  applications in the presentence report.

15         Based upon a preponderance of the evidence

16  presented and the facts reported in the presentence

17  report, while viewing the Sentencing Guidelines as

18  advisory, the Court concludes that the total offense

19  level is 26, that's with the two extra points for

20  sophisticated means, and criminal history category of I,

21  which provides for an advisory guideline range of 63 to

22  78 months.

23         Does Defendant's counsel wish to make any

24  remarks on behalf of the Defendant?

25         MR. HAWTHORN:  Yes, Your Honor.  Your Honor,

1   we would ask that you sentence the Defendant to a home

2   confinement and probation sentence.  We think that is

3   sufficient to address the conduct in this particular

4   case.  And also his background, he has no criminal

5   record.  This was his first offense.  It is not a crime

6   of violence.  He constitutes no danger to society.  He is

7   a well-educated person which I guess cuts both ways.  He

8   should have known better, there's no question about that.

9   But at the same time, his own actions have seriously

10  hampered his future.  He had a promising future as an

11  engineer and now with this what I have called a

12  harebrained scheme, who knows what his future is even

13  though he has an excellent education and great prospects.

14          So considering all that, we would ask that you

15  sentence the Defendant to a home confinement and then

16  probation.

17          THE COURT:  Well, I think he's not eligible

18  for probation.  Is the probation officer -- the

19  presentence report says probation is ineligible; is that

20  correct?

21          PROBATION OFFICER:  Yes, ma'am, that's

22  correct.

23          MR. HAWTHORN:  Well, I think, Your Honor, if

24  you -- you could vary the sentence.  I haven't filed a

25  motion for a variance because I don't think a variance

18

1   was appropriate in this case because I think the

2   guidelines should be between zero and seven in this

3   particular case.  But it doesn't take a motion for

4   variance for the judge to grant a motion for variance.

5   You can do it on your own.

6            THE COURT:  I am intently aware of the

7   variance.  I am just pointing out that probation doesn't

8   seem appropriate.  I don't think I can vary to a

9   probation, but I know I can grant a variance.  I haven't

10  even considered that.  So...

11           PROBATION OFFICER:  I'm not sure in this case

12  a variance would be appropriate either.  Paragraph 56,

13  this is a class B, so I don't know that even by statute

14  he is eligible for probation.

15           THE COURT:  I am not saying probation, I'm not

16  saying a variance for probation.  I don't think a

17  variance would warrant.  I don't think probation is

18  available, but I can certainly grant a variance from the

19  guideline range.  So I understand.  Okay.

20           Does the Defendant wish to make a statement?

21           THE DEFENDANT:  No, Your Honor.

22           THE COURT:  Does the attorney for the

23  Government wish to make any remarks?

24           MR. MANZO:  Your Honor, we would ask for a

25  sentence consistent at the bottom end of the guidelines

19

1  in this case.

2          THE COURT:  Does counsel know of any reason

3  why sentence should not be imposed at this time?

4          MR. HAWTHORN:  No, Your Honor.

5          MR. MANZO:  No, Your Honor.

6          THE COURT:  Well, I think a variance is

7  warranted.  It is troubling that a person with so much

8  promise would make such as Mr. Hawthorn calls it a

9  harebrained decision to do this.  It really doesn't make

10 sense.  Mr. Rai has a good education.  He had a good job.

11 No criminal history.  I don't understand what prompted

12 him to do this, and not just once, but twice.

13         But I think in view of -- I think the offense

14 level overrepresents the seriousness of the offense in

15 this situation because the loan was not funded.  The

16 loans were not funded.  He didn't receive any funds from

17 the Government.  He has got an excellent employment

18 record and education.  It can best be described as

19 aberrant behavior.  I don't know what got into him, but

20 something did.  But I think a variance is in order, just

21 not to probation.  Okay.

22         Pursuant to the Sentencing Reform Act of 1984,

23 having considered the factors noted in 18 U.S.C.,

24 Section 3553(a), and after having consulted the advisory

25 Sentencing Guidelines, it is the judgment of the Court

20

1 that the Defendant, Shashank Shekhar Rai, is hereby

2 committed to the custody of the Bureau of Prisons to be

3 imprisoned for 24 months on Count 1 of the information.

4 It is further ordered the Defendant must pay the United

5 States a fine of $20,000 which is due and payable

6 immediately.

7          It is ordered the Defendant must pay the

8 United States a special assessment of $100 which is due

9 and payable immediately.  Upon release from imprisonment,

10 the Defendant will be on supervised release for a term of

11 two years.  Within 72 hours of release from the custody

12 of the Bureau of Prisons, the Defendant must report in

13 person to the probation office in the district to which

14 the Defendant is released.  The Defendant must not commit

15 another federal, state or local crime and must comply

16 with the standard conditions that have been adopted by

17 this Court.

18          In addition, the Defendant must comply with

19 all applicable mandatory conditions and the following

20 special conditions:

21          The Defendant must provide the probation

22 officer with access to any requested financial

23 information for purposes of monitoring fine payments and

24 employment, as well as efforts to obtain and maintain

25 lawful income.  The Defendant is prohibited from filing

21

1  forms, claims, invoices or other documents used to

2  receive loans, compensation, disbursement or other funds

3  from any federally funded program without the approval of

4  the probation officer.

5          The Court finds this to be a reasonable

6  sentence in view of the nature and circumstances of the

7  offense entailing the Defendant's making false statements

8  to a bank in connection with a fraudulent scheme to

9  obtain forgivable Paycheck Protection Program loans

10  authorized by the Coronavirus Aid, Relief and Economic

11  Security CARES Act, the Defendant's submitting a false

12  and misleading PPP loan application to a participating

13  lender on April 8th, 2020, seeking $10 million in funds,

14  his falsely stating that Rai Family, LLC had 250

15  employees and the company's average monthly payroll was

16  $4 million when the company actually was a shell and had

17  no active operations or employees, his submitting a

18  fraudulent tax return showing that the company had paid

19  $23,228,512 in wages, tips and other compensation along

20  with a false and misleading spreadsheet purporting to

21  show the payroll, his submitting a false and misleading

22  PPP loan application to another participating lender on

23  April 20, 2020, seeking $3,006,200 in funds, his falsely

24  stating that Rai Family, LLC had 264 employees and the

25  company's average monthly payroll was $1,202,480, his

22

1  speaking on the telephone with a representative of the

2  second lender in which he confirmed the same false

3  information and stated that all the employees were in

4  Texas, the discovery of the fraud before the funds were

5  actually disbursed to the Defendant, and his use of

6  sophisticated means to perpetuate the scheme.

7           Although the Court finds the guideline

8  calculations announced at the sentencing hearing to be

9  correct, to the extent they were incorrectly calculated,

10 the Court would have imposed the same sentence without

11 regard to the applicable guideline range in light of the

12 factors set forth in 18 U.S.C. Section 3553(a).

13          The Court finds the sentence will serve as

14 just punishment, promote respect for the law, and deter

15 future violations of the law.

16          You have a right to appeal your conviction if

17 you believe that your guilty plea was somehow unlawful or

18 involuntary or if there was some other fundamental defect

19 in the proceedings that was not waived by your guilty

20 plea.  You have a statutory right to appeal your sentence

21 under certain circumstances, particularly if you think

22 the sentence is contrary to law.

23          A Defendant, however, may waive those rights

24 as part of a plea agreement; and you've entered into a

25 plea agreement which waives certain rights to appeal your

23

1  conviction and sentence.

2          With the exception of the reservation of the

3  right to appeal on specified grounds set forth in the

4  plea agreement, you've waived any appeal, including

5  collateral appeal, of any error which may have occurred

6  surrounding the substance, procedure, or form of the

7  conviction and sentence in this case.  Such waivers are

8  generally enforceable, but if you believe the waiver is

9  unenforceable, you can present that theory to the

10 appellate court.

11         With few exceptions, any notice of appeal must

12 be filed within 14 days of judgment being entered in your

13 case.  If you're unable to pay the cost of an appeal, you

14 may apply for leave to appeal *in forma pauperis*.  If you

15 so request, the clerk of the court will prepare and file

16 a notice of appeal on your behalf.

17         The presentence report is made part of the

18 record and is placed under seal except counsel for the

19 Government and defense may have access to it for purposes

20 of appeal.

21         Are there any other counts?

22         MR. MANZO:  No, Your Honor.

23         THE COURT:  All right.  The Defendant is

24 ordered to surrender to the custody of the United States

25 Marshal immediately after this hearing is over.  Is there

24

1   a particular facility you wish to request?

2           MR. HAWTHORN:  No, Your Honor, there's not.

3           THE COURT:  All right.  Very well.  Thank you

4   and you are excused.

5           COURTROOM DEPUTY:  Your Honor, there's a prior

6   indictment.

7           THE COURT:  Oh, there's a prior indictment.

8           MR. MANZO:  We move to dismiss the prior

9   indictment.

10          THE COURT:  Granted.  Okay.

11          (Proceedings concluded, 3:01 P.M.)

12  COURT REPORTER'S CERTIFICATION

13          I HEREBY CERTIFY THAT ON THIS DATE, JUNE 23,

14  2021, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

15  RECORD OF PROCEEDINGS.

16

17

18

19          *Ruth C. Weese*

20          _____

21               RUTH C. WEESE, RDR-CSR

22

23

24

25