| UNITED STATES DISTRICT COURT | EASTERN DISTRICT OF TEXAS |

| UNITED STATES OF AMERICA | § | |
|---|---|---|
| | § | |
| *versus* | § | CASE NO. 1:21-CR-09(1) |
| | § | |
| SHASHANK SHEKHAR RAI | § | |

### MEMORANDUM AND ORDER

Pending before the court is Defendant Shashank Shekhar Rai's ("Rai") Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (#55), wherein he requests that the court release him from imprisonment due to his medical condition and the threat of Coronavirus Disease 2019 ("COVID-19"). The Government filed a response in opposition (#57), and Rai filed a reply to the Government's response (#58). United States Probation and Pretrial Services ("Probation") filed a report. Having considered Rai's motion, the Government's response, Rai's reply, Probation's report, the record, and the applicable law, the court is of the opinion that the motion should be denied.

I.    Background

On February 9, 2021, Rai pleaded guilty to an Information charging him with False Statement to a Bank, in violation of 18 U.S.C. § 1014, in the Eastern District of Texas, Beaumont Division. He had previously been charged by Complaint with Wire Fraud, in violation of 18 U.S.C. § 1343; Bank Fraud, in violation of 18 U.S.C. § 1344; False Statements to a Financial Institution, in violation of 18 U.S.C. § 1014; and False Statements to the Small Business Administration, in violation of 15 U.S.C. § 645(a). On June 23, 2021, the court sentenced him to 24 months' imprisonment, to be  followed by 2 years of supervised release, and a fine of $20,000.00. Although Rai filed a Notice of Appeal on June 30, 2021, the United States Court of

Appeals for the Fifth Circuit dismissed his appeal on September 8, 2021, pursuant to Rai's motion. Rai is currently housed at Federal Correctional Institution Pollock ("FCI Pollock"), located in Pollock, Louisiana.  His projected released date is February 27, 2023.

II.   Analysis

On December 21, 2018, former President Trump signed the First Step Act of 2018 into law.  *See* First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194.  The Act, in part, amended 18 U.S.C. § 3582(c), which gives the court discretion, in certain circumstances, to reduce a defendant's term of imprisonment:

> (A) the court, upon motion of the Director of the Bureau of Prisons ("BOP"), or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [BOP] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A).  This provision is commonly referred to as "compassionate release."

A.     Exhaustion of Administrative Remedies

Prior to the First Step Act, only the Director of the BOP could file a motion seeking compassionate release.  *See United States v. Franco*, 973 F.3d 465, 467 (5th Cir. 2020) ("Prior to the passage of the First Step Act . . . courts lacked the power to adjudicate motions for compassionate release."), *cert. denied*, 141 S. Ct. 920 (2020); *Tuozzo v. Shartle*, No. 13-4897, 2014 WL 806450, at *2 (D.N.J. Feb. 27, 2014) (denying petitioner's motion for compassionate release because no motion for his release was filed by the BOP).  The First Step Act amended § 3582(c) by providing a defendant the means to appeal the BOP's decision not to file a motion for compassionate release on the defendant's behalf.  *United States v. Cantu*, 423 F. Supp. 3d 345, 347 (S.D. Tex. 2019); *United States v. Bell*, No. 3:93-CR-302-M, 2019 WL 1531859, at *1 (N.D. Tex. Apr. 9, 2019).  The plain language of the statute, however, makes it clear that the court may not grant a defendant's motion for compassionate release unless the defendant has complied with the administrative exhaustion requirement.  18 U.S.C. § 3582(c)(1)(A); *United States v. Garrett*, 15 F.4th 335, 337 (5th Cir. 2021) ("[T]o file a proper motion for compassionate release in the district court, a prisoner must first exhaust the available administrative avenues."); *Franco*, 973 F.3d at 467 (holding that the statutory requirement that a defendant file a request with the BOP before filing a motion for compassionate release in federal court "is *not* jurisdictional but that it *is* mandatory"); *United States v. Alam*, 960 F.3d 831, 833 (6th Cir. 2020) ("Even though [the] exhaustion requirement does not implicate [the court's] subject-matter jurisdiction, it remains a mandatory condition."); *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he exhaustion requirement . . . presents a glaring roadblock foreclosing compassionate release.").  Thus, before seeking relief from the court, a defendant must first submit a request to the warden

of his facility to move for compassionate release on his behalf and then either exhaust his administrative remedies or wait for the lapse of 30 days after the warden received the request.  18 U.S.C. § 3582(c)(1)(A); *Garrett*, 15 F.4th at 338 ("[A]n inmate has two routes by which he may exhaust his administrative remedies.  Both begin with 'requesting that the [BOP] bring a motion on the defendant's behalf.'" (quoting *Franco*, 973 F.3d at 467)); *United States v. Harris*, 812 F. App'x 106, 107 (3d Cir. 2020); *United States v. Springer*, 820 F. App'x 788, 791 (10th Cir. 2020) (defendant "was required to request that the BOP file a compassionate-release motion on his behalf to initiate his administrative remedies" (citing *Raia*, 954 F.3d at 595)); *Alam*, 960 F.3d at 833-34; *United States v. Soliz*, No. 2:16-190-3, 2020 WL 2500127, at *3 (S.D. Tex. May 14, 2020) ("§ 3582(c)(1)(A) does not provide this Court with the equitable authority to excuse [defendant's] failure to exhaust his administrative remedies or to waive the 30-day waiting period." (quoting *United States v. Reeves*, No. 18-00294, 2020 WL 1816496, at *2 (W.D. La. Apr. 9, 2020))).

Here, on August 20, 2021, Rai submitted a request for compassionate release to the warden of the Tallahatchie County Correctional Facility in Tutwiler, Mississippi, where he was housed at the time.  On November 8, 2021, his counsel sent a letter on behalf of Rai to the Warden of FCI Pollock requesting a reduction in sentence to time served or home confinement.  The record contains no response from the warden of either facility.  Although Rai apparently complied with the exhaustion requirement before filing the instant motion, nothing in his motion or reply indicates that extraordinary and compelling reasons exist to release him from confinement under 28 U.S.C. § 3582(c)(1)(A)(i).

B.    Criteria for Release

The Fifth Circuit has held that when a defendant moves for compassionate release, he must establish three criteria.  *United States v. Shkambi*, 993 F.3d 388, 392 (5th Cir. 2021).  First, he must meet one of two conditions listed in § 3582(c)(1)(A)—either the defendant has extraordinary and compelling reasons that warrant a reduction under 18 U.S.C. § 3582(c)(1)(A)(i) or the defendant is at least 70 years of age, has served at least 30 years in prison, and meets the additional requirements of 18 U.S.C. § 3582(c)(1)(A)(ii).  *Id.* at 391.  Second, the defendant "must show that compassionate release is consistent with the applicable policy statements from the [United States Sentencing Commission ("Commission")]."  *Id.* at 392.  Third, the defendant "must convince the district judge to exercise discretion to grant the motion after considering the § 3553(a) factors."[1]  *Id.*; *accord United States v. Keys*, 846 F. App'x 275, 276 (5th Cir. 2021); *United States v. Cooper*, 996 F.3d 283, 287 (5th Cir. 2021).

Section 3582 (c)(1)(A)(i) does not define the "extraordinary and compelling reasons" that may merit compassionate release.  Rather, Congress elected to delegate its authority to the Commission.  *See* 28 U.S.C. § 994(t) (directing the Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples"); *Cooper*, 996 F.3d at 287; *Shkambi*, 993 F.3d at 392.

---

[1] Section 3553(a) directs courts to consider:  the nature and circumstances of the offense and the defendant's history and characteristics;  the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need to deter criminal conduct; the need to protect the public; the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences and sentencing ranges established for defendants with similar characteristics under applicable United States Sentencing Guideline ("U.S.S.G.") provisions and policy statements; any pertinent policy statement of the Commission in effect on the date of sentencing; the need to avoid unwarranted disparities among similar defendants; and the need to provide restitution to the victim.  18 U.S.C. § 3553(a).

Prior to the passage of the First Step Act, the Commission issued a policy statement set forth in U.S.S.G. § 1B1.13, which, along with its commentary, describes what reasons qualify as extraordinary and compelling.[2] However, § 1B1.13 references only motions filed by "the Director of the [BOP]"—not an individual defendant.[3] Consequently, the Fifth Circuit has held that when a defendant files a motion for compassionate release on his own behalf, the Commission's policy statement set forth in § 1B1.13 is not applicable because that policy statement governs only motions filed by the Director of the BOP. *See Cooper*, 996 F.3d at 287-88; *Shkambi*, 993 F.3d at 392.

Nevertheless, while recognizing that they are not binding, the court views the Commission's policy statement contained in § 1B1.13 and the commentary thereto as providing guidance regarding the types of reasons that may be deemed sufficiently "extraordinary and compelling" to warrant compassionate release. *See United States v. Thompson*, 984 F.3d 431, 433 (5th Cir. 2021) ("Although not dispositive, the commentary to § 1B1.13 informs [the court's] analysis as to what reasons may be sufficiently 'extraordinary and compelling' to merit compassionate release."); *United States v. Rivas*, 833 F. App'x 556, 558 (5th Cir. 2020) (upholding denial of compassionate release and recognizing that the court was guided in its

---

[2] In Application Note 1 to § 1B1.13 of the U.S.S.G., the Commission defined "extraordinary and compelling reasons" to include the following four categories of circumstances:  (i) certain medical conditions of the defendant; (ii) the defendant is 65 years or older and meets other requirements; (iii) the defendant's family has specified needs for a caregiver; and (iv) other reasons in the defendant's case that establish an extraordinary and compelling reason.  U.S.S.G. § 1B1.13 cmt. n.1.

[3] U.S.S.G. § 1B1.13 was last amended on November 1, 2018.  The Commission has, to date, been unable to amend § 1B1.13 to incorporate the changes wrought by the First Step Act due to the lack of a quorum.  The Commission consists of seven voting members and, per statute, requires four members for a quorum to amend the guidelines.  28 U.S.C. §§ 991(a), 994(a).  At present, the Commission has only one voting member.

analysis by the commentary to U.S.S.G. § 1B1.13).  A review of dictionary definitions also sheds light on the meaning of these terms.  The word "extraordinary" is defined as "going beyond what is usual, regular, or customary . . . exceptional to a very marked extent," whereas the word "compelling" is defined as "forceful . . . demanding attention . . . convincing." *Extraordinary*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2007); *Compelling*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2007); *see United States v. Mitchell*, No. 15-20609, 2021 WL 1827202, at *2 (E.D. Mich. May 7, 2021).  "Courts have interpreted 'extraordinary' in the context of compassionate release as 'beyond what is usual, customary, regular, or common,' and a 'compelling reason' as 'one so great that irreparable harm or injustice would result if the relief is not granted.'" *Mitchell*, 2021 WL 1827202, at *2 (quoting *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *5 (E.D. Mich. May 15, 2020); *United States v. Sapp*, No. 14-20520, 2020 WL 515935, at *3 (E.D. Mich. Jan. 31, 2020)).

       1.    <u>Medical Condition</u>

In the instant motion, Rai, age 32, contends that he is eligible for compassionate release due to his medical condition—specifically, that he is overweight and suffers from "borderline hypertension."  Although not binding on the court, § 1B1.13 suggests that extraordinary and compelling reasons exist regarding a defendant's medical condition when the defendant is "suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory)" or when a defendant is "suffering from a serious physical or medical condition," "suffering from a serious functional or cognitive impairment," or "experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of

the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 cmt. n.1(A).

When Rai was questioned by Probation about his physical condition in connection with his Presentence Investigation Report ("PSR"), prepared on April 16, 2021, and later revised on May 18, 2021, he reported that he had no history of serious or chronic health conditions and voiced no concerns about his health. Rai's PSR states that he is 5 feet, 10 inches tall and weighs 190 pounds, giving him a body mass index ("BMI") of 30.8, indicating that he was overweight at the time his PSR was prepared.[4] According to his BOP medical records, Rai weighed 174 pounds on November 16, 2021, giving him a BMI of 24.7, rendering him neither obese nor overweight per the CDC guidelines. Rai further contends that he suffers from "borderline hypertension" (high blood pressure). When screened by correctional facility medical personnel on July 29, 2021, and August 7, 2021, however, Rai responded, "No," when asked whether he had any special health care needs or current medical complaints, including "high blood pressure." When asked if he was currently taking any medications, he responded "None." His BOP medical records reflect that on October 27, 2021, Rai denied having "Hypertension" or any Cardiovascular problems, as recorded by Blake Velota, R.N. He further indicated that he had no medical diagnoses, was taking no medication, and had no disabilities. Rai's most recent blood pressure readings[5] recorded in his

---

[4] According to the Centers for Disease Control and Prevention ("CDC"), a BMI below 18.5 is underweight, a BMI between 18.5 and 24.9 is normal, a BMI between 25 and 29.9 is overweight, and a BMI of 30 or above is obese.

[5] According to the CDC, a "Normal" systolic level is less than 120 mm Hg with a diastolic of less than 80 mm Hg; the "At Risk" systolic range is 120 to 139 mm Hg with a diastolic range of 80 to 89 mm Hg; and a "High Blood Pressure" systolic level is 140 mm Hg or higher with a diastolic of 90 mm Hg or higher.

medical records—97/66 on November 16, 2021, 129/77 on September 28, 2021, 122/78 on September 25, 2021, and 104/71 on August 7, 2021—indicate that he is merely "at risk" for or does not have hypertension.  Rai is classified as a BOP Medical Care Level 1 inmate.  According to the BOP's Clinical Practice Guidance, dated May 2019, Care Level 1 inmates "are less than 70 years of age and are generally healthy.  They may have limited medical needs that can be easily managed by clinician evaluations every 6-12 months."

None of Rai's alleged medical conditions are terminal or substantially diminish his ability to provide self-care, nor do they otherwise present extraordinary and compelling reasons justifying compassionate release.  *See Thompson*, 984 F.3d at 433.  To the contrary, Rai's afflictions, to the extent he has them, are well managed with monitoring.  *See id.*  The court acknowledges that, according to the CDC website, two of Rai's purported medical problems—specifically, hypertension and being overweight—can make him more likely to become severely ill should he contract COVID-19; nonetheless, such commonplace maladies do not make Rai's case "extraordinary."  *See id.* at 434.

According to the CDC, 45% of the adults in the United States (108 million) have hypertension, and of those, only about 24% have their condition under control.  In addition, 42.5% of the adult population in the United States is obese and 73.6% is overweight.  Due to their pervasiveness, hypertension and being overweight cannot be deemed "extraordinary" in order to merit compassionate release.  *See id.* (noting that neither hypertension nor high cholesterol made the defendant's case "extraordinary" because "nearly half of the adult population in the United States suffers from hypertension" and "roughly 12% of Americans suffer from high cholesterol"); *accord United States v. Harmon*, 834 F. App'x 101, 101 (5th Cir. 2021) (affirming denial of

compassionate release to a 52-year-old woman who was obese with a body mass index of 36); *United States v. Hodgin*, No. 4:15-CR-40110-02-KES, 2021 WL 928179, at *3 (D.S.D. Mar. 11, 2021) (denying compassionate release to inmate who suffers from hypertension, Type 2 diabetes, kidney disease, hyperlipidemia, arthritis, and several other medical conditions); *United States v. Williams*, No. CR 15-83-SDD-EWD, 2021 WL 414825, at *3 (M.D. La. Feb. 5, 2021) (denying compassionate release to inmate with obesity and Type 2 diabetes because there was no evidence these conditions had diminished his ability to provide self-care within the facility); *United States v. Slone*, No. 7:12-05-KKC-4, 2021 WL 164553, at *1 (E.D. Ky. Jan. 19, 2021) (holding that inmate who suffered from heart disease (for which he had a stent), chronic obstructive pulmonary disease (COPD), high cholesterol, obesity, and depression had not established extraordinary and compelling reasons for compassionate release as his condition was not terminal and did not diminish his ability to provide self-care within the prison environment); *United States v. Grant*, No. 16-00172-01, 2021 WL 149308, at *4 (W.D. La. Jan. 15, 2021) (noting that "while obesity is an underlying medical condition that poses increased risk of severe illness from COVID-19, courts have found that obesity—alone or even paired with other medical conditions—does not provide adequate grounds for compassionate release"); *United States v. Sentimore*, No. 04-382, 2020 WL 7630778, at *2 (E.D. La. Dec. 22, 2020) (finding that defendant's morbid obesity did not rise to the level of an extraordinary and compelling circumstance that would justify his early release); *United States v. Cotto*, No. CV 16-36, 2020 WL 5761192, at *2 (E.D. La. Sept. 28, 2020) (recognizing the seriousness of diabetes and obesity but denying compassionate release because inmate had not shown that he was unable to take care of himself within the confines of the facility or that the BOP could not manage his medical conditions appropriately in view of medical

records showing that he was being administered the necessary care); *United States v. Durham*, No. 3:18-cr-251-MOC-DCK-1, 2020 WL 5577884, at \*2 (W.D.N.C. Sept. 17, 2020) (finding the fact that the defendant has hypertension, a condition that may increase his risk for severe illness from COVID-19, without more, does not present an "extraordinary and compelling reason" for compassionate release); *United States v. Wilson*, No. 2:18cr132, 2020 WL 4901714, at \*5 (W.D. Wash. Aug. 20, 2020) (rejecting the notion that inmate's hypertension claim was sufficient to justify early termination of sentence); *United States v. Gordon*, No. 15-20609, 2020 WL 3971013, at \*3 (E.D. Mich. July 14, 2020) (denying compassionate release to an obese defendant, reasoning that because "42.4% of American adults are obese and [an] additional 32% are overweight," obesity "is not a condition so [extraordinary] that injustice would result if the relief is not granted"); *United States v. Wright*, No. CR TDC-17-0388, 2020 WL 2571198, at \*3 (D. Md. May 21, 2020) (denying compassionate release to an inmate who suffered from hypertension, diabetes, chronic kidney disease, and asthma).

In this instance, Rai's BOP records reveal that he is housed in general population, is ambulatory, has no medical restrictions, is eligible for regular duty work assignments, is cleared for food service, and has repeatedly tested negative for COVID-19.  He is able to provide self-care in the institutional setting and is not limited in his activities of daily living.  Thus, Rai has failed to establish the existence of any current medical problems, much less any disorders that would constitute extraordinary and compelling reasons to reduce his sentence.

2.  COVID-19

Rai also expresses concerns regarding the spread of COVID-19 among the prison population.  Nevertheless, as of January 12, 2022, the figures available at www.bop.gov list 6

inmates (out of a total inmate population of 1,539) and 10 staff members at FCI Pollock as having confirmed positive cases of COVID-19, 570 inmates and 33 staff members who have recovered, and 0 inmates who succumbed to the disease.   Thus, it appears that the facility where Rai is housed is handling the outbreak appropriately and providing adequate medical care.

Although Rai expresses legitimate concerns regarding COVID-19, he does not establish that the BOP cannot manage the outbreak within his correctional facility or that the facility is specifically unable to treat Rai, if he were to contract the virus and develop COVID-19 symptoms, while incarcerated.  *See Thompson*, 984 F.3d at 435 ("Fear of COVID doesn't automatically entitle a prisoner to release."); *Raia*, 954 F.3d at 597 ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread."); *United States v. Banks*, No. CR 15-0080-02, 2020 WL 6839267, at *4 (W.D. La. Nov. 20, 2020) ("This Court cannot equate the generalized fear of COVID-19 to an extraordinary and compelling reason to support compassionate release, nor will it undermine BOP's criteria to determine eligibility for sentence reductions or home confinement."); *United States v. Vasquez*, No. CR 2:18-1282-S-1, 2020 WL 3000709, at *3 (S.D. Tex. June 2, 2020) ("General concerns about the spread of COVID-19 or the mere fear of contracting an illness in prison are insufficient grounds to establish the extraordinary and compelling reasons necessary to reduce a sentence." (quoting *United States v. Koons*, 455 F. Supp. 3d 285, 292 (W.D. La. 2020))); *United States v. Clark*, 451 F. Supp. 3d 651, 656 (M.D. La. 2020) (finding the defendant had failed to present extraordinary and compelling reasons to modify his prison sentence because he "does not meet any of the criteria set forth by the statute"

and he "cites no authority for the proposition that the fear of contracting a communicable disease warrants a sentence modification"). Furthermore, contracting the virus while incarcerated, even in conjunction with preexisting health conditions, is insufficient to establish exceptional and compelling circumstances warranting compassionate release. *See United States v. Jackson*, No. 3:16-CR-196-L-1, 2020 WL 4365633, at *2 (N.D. Tex. July 30, 2020) (finding that defendant had failed to present extraordinary and compelling reasons for compassionate release despite suffering from previous underlying health conditions and testing positive for COVID-19).

Moreover, the BOP is in the process of administering the COVID-19 vaccine to inmates and staff. To date, the BOP has administered approximately 283,304 doses of the vaccine. According to www.bop.gov, Federal Correctional Complex Pollock, where the defendant is housed, has fully inoculated 2,225 inmates and 416 staff members. Indeed, according to his medical records, Rai reported receiving doses of the Pfizer-Bio/NTech vaccine in April and May 2021. In the Fifth Circuit and elsewhere, courts have denied early release to inmates with a variety of medical conditions who have been vaccinated for COVID-19. *See United States v. Walker*, No. 20-cr-20027, 2021 WL 2474088, at *3 (C.D. Ill. June 17, 2021) (holding that because defendant was fully vaccinated, his underlying health conditions—diabetes, heart disease, high blood pressure, asthma, and substance abuse—alone, were insufficient to establish extraordinary and compelling reasons justifying compassionate release); *United States v. Parham*, No. 1:19-CR-133-LG-RHW-1, 2021 WL 1911899, at *2 (S.D. Miss. May 12, 2021) (finding that "generalized concerns of contracting COVID-19[] are not an 'extraordinary and compelling reason'" where the defendant had received the COVID-19 vaccine); *United States v. Meyer*, No 1:14-cr-00148-01-MC, 2021 WL 1895240, at *1-2 (D. Ore. May 11, 2021) (denying

compassionate release to inmate with heart disease, obesity, hyperlipidemia, and a history of smoking because he was fully vaccinated and there was a low infection rate at the facility where he was housed); *United States v. Schad*, No. CR 2:17-225-3, 2021 WL 1845548, at *4 (S.D. Tex. May 5, 2021) (denying compassionate release where the defendant had been fully vaccinated against COVID-19); *United States v. Grummer*, No. 08-CR-4402-DMS, 2021 WL 568782, at *2 (S.D. Cal. Feb. 16, 2021) (denying compassionate release and noting that "[a]lthough Defendant suffers from several chronic medical conditions, his vaccination significantly mitigates the risk that he will contract COVID-19"); *United States v. Beltran*, No. 6:16-CR-00004, 2021 WL 398491, at *3 (S.D. Tex. Feb. 1, 2021) (denying compassionate release to a high-risk inmate with myriad underlying medical conditions who received the vaccine, finding that "vaccination significantly reduces [the] risk of contracting COVID-19 or experiencing complications related to a COVID-19 infection"); *accord United States v. Nunez-Arias*, No. CR H-16-436, 2021 WL 1537323, at *3 (S.D. Tex. Apr. 19, 2021).

    C.    Section 3553(a) Factors

The court further finds that compassionate release is not merited in light of the applicable factors set forth in 18 U.S.C. § 3553(a).  *See* 18 U.S.C. § 3582(c)(1)(A) (requiring courts to consider the § 3553(a) factors before granting compassionate release); *United States v. Shorter*, 850 F. App'x 327, 328 (5th Cir. 2021) (finding that the court did not abuse its discretion in denying compassionate release after balancing the § 3553(a) factors); *Keys*, 846 F. App'x at 276; *Shkambi*, 993 F.3d at 392; *Thompson*, 984 F.3d at 435 n.11 (collecting cases); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020).  Rai's offense of conviction entails his making false statements to two banks in connection with a fraudulent scheme to obtain forgiveable

Paycheck Protection Program ("PPP") loans authorized by the Coronavirus Aid, Relief, and Economic Security (CARES) Act in which he used sophisticated means to perpetrate the fraud. Rai submitted a false and misleading PPP loan application to a participating lender on April 8, 2020, seeking $10,000,000.00 in funds.  Rai falsely stated that Rai Family, LLC, had 250 employees and that the company's average monthly payroll was $4,000,000.00 when, in reality, the company was only a shell and had no active operations or employees.  He also submitted a fraudulent tax return showing that the company had paid $23,228,512.00 in wages, tips, and other compensation along with a false and misleading spreadsheet purporting to show the payroll expenditures.  Rai submitted another fraudulent PPP loan application to another participating lender on April 20, 2020, seeking $3,006,200.00 in funds.  He falsely stated that Rai Family, LLC, had 264 employees and the company's average monthly payroll was $1,202,480.00.  He spoke on the telephone with a representative of the second lender in which he confirmed the same false information and stated that all the employees were in Texas, when, in fact, there were no employees.  The fraud was discovered before any funds were actually disbursed to Rai.

Although the intended loss totaled $13,006,200.00 and the applicable guideline range was 63 to 78 months' imprisonment, the court imposed a sentence of only 24 months' imprisonment. The court departed downward due to Rai's educational and vocational skills, his employment record, the fact that he caused no actual loss to the Government and did not profit from the offense, the offense level substantially overstated the seriousness of the offense under the circumstances, he had no criminal record, and the conduct appeared to reflect aberrant behavior on the part of Rai.  According to his PSR, at the time he committed his offense of conviction, Rai had earned a Bachelor of Science degree in chemical engineering from the University of Houston,

was enrolled in an online Master of Business Administration program, and worked as a process design engineer for ExxonMobil in Beaumont, Texas, where he had been employed for 8 years and was paid an annual salary of $131,000.00.  He reported numerous assets and only $241.00 in monthly expenses and $13.17 in total liabilities, listing his net worth as being in excess of $482,000.00.  Hence, despite his affluence, Rai was not satisfied and attempted to take over $13,000,000.00 from the Government by means of obtaining forgiveable loans that were intended for small businesses that were incurring substantial losses and their employees who were without work due to the pandemic.  As the Government points out:  "The defendant attempted to steal millions of dollars by taking advantage of the pandemic.  He now, despite being vaccinated and a low risk of hospitalization, is using the same pandemic to attempt to escape punishment."

"Compassionate release is discretionary, not mandatory, and [may] be refused after weighing the sentencing factors of 18 U.S.C. § 3553(a)."  *Chambliss*, 948 F.3d at 693; *accord Keys*, 846 F. App'x at 276 (finding that Defendant's argument that the court gave too much weight to his criminal history, "amount[ed] to a mere disagreement with the court's balancing of the § 3553(a) factors, which is not a sufficient ground for reversal").  Granting Rai compassionate release under these circumstances would fail to provide just punishment for his offense or promote respect for the law.  In *Chambliss*, the Fifth Circuit upheld the denial of compassionate release due to the defendant's not yet having served a sufficient portion of his sentence.  948 F.3d at 694.  The district court determined that the defendant's terminal illness "constitut[ed] 'an extraordinary and compelling reason for a sentence reduction' and that he '[did] not present a danger upon release,'" but denied release because "releasing [the defendant] after serving only 14 years of a 30-year sentence minimizes both the impact of [the defendant's] crime and seriousness of the offense."

16

*Id.* at 693-94.  "Moreover, the [district] court, citing the § 3553(a) factors, determined that requiring [the defendant] to serve the remainder of his sentence would 'provide just punishment for the offense' and 'afford adequate deterrence to criminal conduct.'"  *Id.*; *see Thompson*, 984 F.3d at 434-35 (observing that the courts that have granted compassionate release "largely have done so for defendants who had already served the lion's share of their sentences and presented multiple, severe, health concerns").  In the instant case, releasing Rai, who has no documented health concerns, after serving less than 8 months of his 24-month sentence would similarly minimize the impact of his crime and the seriousness of his offense as well as fall short of providing just punishment and adequate deterrence to criminal conduct.  In view of the nature and circumstances of his offense of conviction, the court cannot conclude that Rai's early release from prison would afford adequate deterrence or protect the public, as he continues to pose an economic danger to other persons and to the community as a whole.

### D.  Home Confinement

As an alternative to compassionate release, Rai requests that the court sentence him to home confinement.  Probation, however, advises that he does not have a release plan that has been investigated or approved by the Probation Office.  Moreover, Rai misapprehends the application and construction of the CARES Act.  The Act "expanded the [BOP]'s power to 'place a prisoner in home confinement' under § 3624(c)(2) . . . but reserved the determination of 'suitable candidates' for home confinement to the [BOP]."  *United States v. Williams*, 829 F. App'x 138, 139 (7th Cir. 2020) (quoting *Alam*, 960 F.3d at 836)).  The CARES Act states in relevant part:

> HOME CONFINEMENT AUTHORITY.—During the covered emergency period, if the Attorney General finds that emergency conditions will materially affect the functioning of the [BOP], the Director of the [BOP] may lengthen the maximum

> amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate.

Coronavirus Aid, Relief, And Economic Security Act, Pub. L. No. 116-136, 134, § 12003 Stat. 281, 516 (2020). The CARES Act does not grant the court the authority to make home confinement determinations. "Nor for that matter is any such role envisioned under § 3624(c)(2), which authorizes the [BOP] 'to the extent practicable, [to] place prisoners with lower risk levels and lower needs on home confinement . . . .' As the Supreme Court emphasizes, the [BOP] has 'plenary control' over an inmate's placement." *Williams*, 829 F. App'x at 139 (quoting *Tapia v. United States*, 564 U.S. 319, 331 (2011)).

Hence, the BOP has the exclusive authority to determine where a prisoner is housed; thus, the court is without authority to order home confinement. 18 U.S.C. § 3621(b); *Cheek v. Warden of Fed. Med. Ctr.*, 835 F. App'x 737, 739 (5th Cir. 2020) (holding that "the pandemic did not create judicial authority to grant home confinement"); *United States v. Donnell*, 476 F. Supp. 3d 514, 522 (E.D. Tex. 2020); *Ambriz v. United States*, 465 F. Supp. 3d 630, 633 (N.D. Tex. 2020); *United States v. Miller*, No. 2:17-CR-015-D (02), 2020 WL 2514887, at *1 (N.D. Tex. May 15, 2020) ("[N]either the CARES Act nor the First Step Act authorizes the court to release an inmate to home confinement."). Further, the BOP's decision regarding home confinement is not subject to judicial review. *See* 18 U.S.C. § 3621(b); *United States v. Powell*, No. CR 15-496-4, 2020 WL 2848190, at *2 n.5 (E.D. Pa. June 2, 2020) ("[T]o the extent that [Defendant] seeks to appeal the prison's denial of home confinement, such decision is not reviewable by this Court."). Indeed, it is well established that "[n]o inmate has a constitutional right to be housed in a particular place or any constitutional right to early release." *Cheek*, 835 F. App'x at 740. As a consequence, "[i]t

is not for a court to step in and mandate home confinement for prisoners, regardless of an international pandemic." *Id*.

Furthermore, the BOP has instituted a comprehensive management approach that includes screening, testing, appropriate treatment, prevention, education, and infection control measures in response to COVID-19.  In response to a directive from the former United States Attorney General in March 2020, the BOP immediately began reviewing all inmates who have COVID-19 risk factors, as described by the CDC, for the purpose of determining which inmates are suitable for placement on home confinement.  *See United States v. Collins*, No. CR 04-50170-04, 2020 WL 1929844, at *3 (W.D. La. Apr. 20, 2020).  The BOP notes that inmates need not apply to be considered for home confinement, as this is being done automatically by case management staff. Since March 26, 2020, the BOP has placed 36,921 inmates on home confinement.  The March 2020 directive is limited to "eligible at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities."  *United States v. Castillo*, No. CR 2:13-852-1, 2020 WL 3000799, at *3 (S.D. Tex. June 2, 2020).

In his Memorandum to the BOP dated March 26, 2020, former Attorney General Barr acknowledges that the Department of Justice ("DOJ") has an obligation to protect both BOP personnel and inmates.  He also notes that the DOJ has the responsibility of protecting the public, meaning that "we cannot take any risk of transferring inmates to home confinement that will contribute to the spread of COVID-19 or put the public at risk in other ways."  The Attorney General issued a subsequent Memorandum to the BOP on April 3, 2020, in which he emphasizes that police officers protecting the public face an increased risk from COVID-19 and cannot avoid

exposure to the virus, with their numbers dwindling as officers who contract the virus become ill

or die or need to recover or quarantine to avoid spreading the disease.  Accordingly, he cautions:

> The last thing our massively over-burdened police forces need right now is the
> indiscriminate release of thousands of prisoners onto the streets without any
> verification that those prisoners will follow the laws when they are released, that
> they have a safe place to go where they will not be mingling with their old criminal
> associates, and that they will not return to their old ways as soon as they walk
> through the prison gates.

As the court noted in *United States v. Preston*, "[t]he best predictor of how [Defendant]

will behave if he were to be released is how he behaved in the past, and his track record is a poor

one." No. 3:18-CR-307-K, 2020 WL 1819888, at *4 (N.D. Tex. Apr. 11, 2020) (quoting *United

States v. Martin*, 447 F. Supp. 3d 399, 403 (D. Md. 2020)).  Here, Rai's past behavior and

attempt to minimize the consequences of his fraudulent actions by utilizing the same pandemic that

gave rise to his conviction to now gain early release from an extremely lenient prison sentence

based on alleged medical conditions that are minimal, at most, give cause for concern as to his

future conduct.

III.   <u>Conclusion</u>

In sum, Rai has failed to satisfy his burden of showing the necessary circumstances to

warrant relief under the statutory framework to which the court must adhere.  *See United States

v. Dodge*, No. 17-323-01, 2020 WL 3668765, at *5 (W.D. La. July 6, 2020) (stressing that "the

rampant spread of the coronavirus and the conditions of confinement in jail, alone, are not

sufficient grounds to justify a finding of extraordinary and compelling circumstances"); *Koons*,

455 F. Supp. 3d at 291-92 (same).  As the court observed in *Koons*, rejecting the notion that it has

"carte blanche" authority to release whomever it chooses, "[t]he Court cannot release every

prisoner at risk of contracting COVID-19 because the Court would then be obligated to release every prisoner." *Dodge*, 2020 WL 3668765, at *6; *Koons*, 455 F. Supp. 3d at 292.

Consistent with the foregoing analysis, Rai's Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (#55) is DENIED.

SIGNED at Beaumont, Texas, this 13th day of January, 2022.

_____

MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE